[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION TO MODIFY VISITATION
CT Page 1349
The plaintiff; William Bowles and the defendant, Debbie Bowles, n/k/a Debbie Giordano, were divorced pursuant to a judgment of dissolution issued on December 1, 1994. This judgment granted physical custody of the parties' two minor children Thomas (born March 12, 1981) and Ryan (born April 28, 1988) to the defendant. Subsequently, pursuant to an order issued on August 7, 1997, custody of the youngest son, Ryan, was transferred to the plaintiff with visitation rights to the defendant. Pending before the court is a motion to modify visitation and for a psychiatric evaluation filed by attorney Anthony Wallace, the court appointed attorney and guardian ad litem for Ryan. This motion seeks to modify the defendant's visitation so that she has supervised visitation and seeks to require the defendant to undergo psychiatric evaluation. The relevant evidence presented to the court on this motion is as follows.
After physical custody was transferred to the plaintiff, the defendant started to telephone the plaintiff frequently. In many instances, the defendant did not speak to the plaintiff directly, but left messages to him or his present wife on either the plaintiff's home or work answering machines. Some of these messages were transcribed and filed as exhibits. See November 6, 1988 Exhibits 2, 3-1, and 3-2, January 25, 1999 Exhibit Wallace-1-A. According to the plaintiff's testimony and as evidenced by the transcripts, these telephone calls from the defendant were often vile, coarse, virulent tirades which included threatening and harassing statements. The evidence indicates that at least some of the messages were made in the presence of Ryan. The following are edited examples of the messages left by the defendant on the plaintiff's answering machines.
 "Listen a — hole, I know it's hard for you to get it `cuz you're so stupid, but my car needs brakes . . . Thomas had SAT's, my mother had to bring me, my car's not going to be ready. If your son misses his game because you are a stupid a — hole who just wants his way, I'm gonna contempt ya in court. I want you to lose Ryan. You don't deserve to have him, you stupid idiot." (Saturday, October 10, 1998).
"You spiteful fat ass bastard. I'm going to get a court order CT Page 1350 so that you never call this house and you never see us again. And if its Ryan you want, you can stick him up your a — , 'cuz I never wanna fu---- see your face or hear from you again. You abusive no good fu---- bastard." (Saturday, October 19, 1998).
 "Bill. This message is for you. I want you to know I'm going to spend my life making your life miserable for all the things you've done to me and my kids." (Friday, November 13, 1998).
 "Let me tell you something, Bill. I better get money this week, and better get it no later than Wednesday . . . I'm working at a job that I don't like and I'm mighty pissed off. I'm gonna tear you a new a — hole and I don't care if you call the cops, tell the judge or whatever. Nobody's gonna help you." (Friday, November 13, 1998).
 "This message is for you Mr. and Mrs. Bowles, and don't worry Ryan is nowhere in sight or earshot. I want my money and I want it now. I'm sick of living like a pauper. I made you for twenty tears and I expect you to provide back for me and to educate me and take care of these kids. As for you, you whore-faced bitch, ugly bitch, who's such a pig, you're not gonna get a dime. The both of you are gonna have a miserable life `cuz I'm gonna make your lives miserable until I get money and get to live the way I used to live." (Sunday, November 15, 1998).
 "Listen, you fu----- piece of sh — , I hate your fuc--- guts. You're buying wreaths and lights while your son and I are starving? You and that fu----- whore are gonna die. If it's the last thing I do, the two of you are gonna die." (Sunday, November 29, 1998).
 "Well, Bill, we learn by experience. I guess it doesn't feel too good to be harassed like I've been harassed for five years with the kids by you. I guess it doesn't feel good when court orders aren't obeyed like you haven't obeyed them for five years. Like a taste of your own medicine that you've been giving out for five years? How does it feel?" (Friday, December 4, 1998).
The defendant had visitation with Ryan the weekend of December 11, 1998. During this visitation, the defendant called CT Page 1351 the plaintiff and informed him that she was not going to return Ryan to the plaintiff's custody unless he gave her $1,000. The plaintiff refused to make this payment, and when the visitation period was over, the defendant refused to return Ryan to the plaintiff. The defendant testified that she knew that she was violating a court order, but nevertheless took this action because of her frustration with the court proceedings and because Ryan desired to live with her. On one hand, she testified that the most important issues concerned Ryan's interests and not money, but on the other hand, she admitted that she told the plaintiff that he would have to pay her $1,000 before she would return Ryan to him.
On December 14, 1998, attorney Wallace filed an ex parte motion seeking an order temporarily terminating visitation, directing the immediate return of Ryan to his father's custody and authorizing the assistance of law enforcement officers to acquire Ryan's physical custody. This motion was granted. On December 14, 1998, when the plaintiff and the police arrived at the defendant's residence, the defendant was at work, but both children were home. After getting Ryan and while on his way home, the plaintiff saw the defendant on her way to her residence. She turned her vehicle in what appeared to be an effort to hit the plaintiff's vehicle or force it to the side of the road. There was no contact between the vehicles. Later when the plaintiff arrived at his residence with Ryan, the defendant was waiting for him in her vehicle. At a high rate of speed, she drove her vehicle at the plaintiff's vehicle barely missing it. The plaintiff swerved from his driveway onto a neighbor's lawn and sped away. The defendant followed, engaging in a high speed chase. The plaintiff called the police from his car phone. He was directed to the location of a state trooper, who followed and pulled the vehicles over. When the vehicles stopped, the defendant ran to the plaintiff's vehicle and started hitting and kicking the car. The officer, after some degree of commotion, handcuffed the defendant and placed her under arrest. The defendant testified that she did not know that Ryan was in the plaintiff's car during this incident and did not intend to collide with the plaintiff's vehicle. She testified that she only wanted to "scare" him. The plaintiff testified that Ryan was emotionally upset by this incident.
On December 22, 1998, the court held a hearing concerning the court's temporary order terminating visitation. The court continued this order terminating the defendant's visitation until CT Page 1352 further court order. On January 8, 1999, the court modified this order to allow supervised telephone contact between the defendant and Ryan.
In summary, the defendant has made telephone calls threatening and harassing the plaintiff, she has held her son as "ransom" for money, and she has risked injury to herself, the plaintiff, Ryan and possibly innocent bystanders by the reckless operation of her motor vehicle. Nevertheless, she does not believe that she has done anything to warrant any modification of her visitation rights. Her anger and bitterness against the plaintiff and her frustration with the judicial process have so consumed her that she has lost the capacity to make rational judgments. She not only fails to appreciate the inappropriateness of her behavior, but she also fails to appreciate that her behavior cannot be justified by the reasons she advances. She has externalized her problems to such an extent that she does not assume any responsibility for her actions or for how her circumstances are exacerbated by her own conduct. Anyone who fails to accept or agree with her positions are viewed with distrust and hostility.
These conclusions were confirmed by Dr. Roy Nisenson, an expert in family psychology appointed by the court to evaluate the defendant's mental status. Dr. Nisenson evaluated the defendant in August 1998 and made positive findings at that time concerning the defendant's emotional well-being and judgmental abilities. However, he testified that after he filed his report, the defendant began to call him repeatedly for advice and support, which he explained to her he was unable to give. Her calls became increasingly and excessively emotional, hostile and offensive. Eventually, he warned her that he would call the police if her calls to him did not stop.
Dr. Nisenson testified that at the present time, the defendant's stress and frustration levels are causing her to regress to a point where she loses the ability to control herself fully, make rational decisions, and avoid inappropriate behavior. His recommendation is that the defendant receive counseling from an experienced therapist and that her visitation be supervised until she is more in control.
The court finds that the defendant's recent behavior and these recent events constitute a change of circumstances warranting review of the visitation order. The standard CT Page 1353 controlling the court's consideration of any modification of visitation is the best interests of the child. There is no question whatsoever that unsupervised visitation between the defendant and Ryan is not in the child's best interests in light of the defendant's present volatile, emotional and irrational state. Without supervision and therapeutic intervention, the defendant's behavior will eventually put Ryan at further, serious risk, as evidenced by the car chase that resulted in the defendant's arrest. The evidence establishes that the defendant fails to grasp how her anger against the plaintiff does not justify her behavior. For example, her claim that she did not know that Ryan was in the plaintiff's car during the incident does not excuse her behavior. Ryan was in the car and her totally inappropriate and reckless behavior placed Ryan at serious risk and traumatized him. Her inability to understand or appreciate how her conduct is unjustified by her grievances and anger, or how her behavior exposes Ryan to emotional and physical harm clearly mitigate against continued, unsupervised visitation at this time.
The court orders a termination of unsupervised visitation between the defendant and Ryan and orders the following:
1. The defendant shall have supervised visitation with Ryan once a week. This visitation shall be supervised by the Southern Connecticut State University Family Clinic and shall be extended to twice a week if consistent with the Clinic's program conditions. The exact dates and times that this visitation will take place shall be coordinated between the parties through Attorney Wallace. This supervised visitation may include Thomas. The plaintiff is ordered to transport Ryan for all such visitations and to cooperate as necessary to facilitate this supervision and the therapy as ordered below.
2. The defendant shall participate in therapeutic counseling at the Southern Connecticut State University Family Clinic. This counseling shall include Ryan and/or the plaintiff in the manner and to the extent requested by the therapist. This therapy shall be directed to the defendant's anger and emotional state as more particularly described in this decision, and may include other issues as determined by the therapist to be relevant to the restoration of unsupervised visitation.
3. Until the supervised visitation begins, the supervised telephone calls between the defendant and Ryan shall continue. In CT Page 1354 the absence of a motion recommending some other person to act as monitor, these conversations shall be monitored by Attorney Wallace or his designee.
This supervised visitation and therapeutic counseling is contemplated to be temporary and is directed to restoring unsupervised visitation. The restoration of unsupervised visitation shall be governed by what is in the child's best interests. The restoration of unsupervised visitation shall also be conditioned on the defendant's good faith participation in the supervised visitation and counseling, and the court's consideration of sealed reports filed by the therapist with the court These reports shall be sealed and shall be subject to review only by the attorneys and the parties of record. The first such report from the therapist shall be filed within 90 days after the therapy begins. The defendant shall pay any program costs or therapist fees associated with the supervised visitation or the counseling.
Dated February 4, 1999.
_________________ Steven, J.